UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

D.A. REALESTATE INVESTMENT, LLC,

DANNY FOX,

    and,

REAL PROPERTY KNOWN AS
TAX PARCEL NO.: 49314300

       Plaintiffs,

v.                                Civil No. 2:21cv653

CITY OF NORFOLK,

       Defendant.

## OPINION AND ORDER

This matter is before the Court on cross-motions for summary judgment in the above referenced civil case. ECF Nos. 41, 43. Because the facts and legal questions are adequately presented in the motion and subsequent briefs, and because oral argument would not aid in the decisional process, the Court finds that a hearing is unnecessary. After careful consideration of the briefs submitted by the parties, the Court **GRANTS** Defendant's summary judgment motion and **DENIES** Plaintiffs' summary judgment motion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The parties dispute many of the relevant facts in this case. Because the Court resolves these motions in Defendant's favor, and must interpret the facts in Plaintiffs' favor when evaluating

Defendant's summary judgment motion,[1] the Court sets forth below the facts as presented by Plaintiffs, which are primarily undisputed by Defendant. The Court further supplements such factual account with additional facts offered by Defendant that are not directly disputed by Plaintiffs.

### a. Plaintiffs' Facts[2]

Plaintiff D.A. Realestate Investment, LLC, ("DARI") is an inactive Virginia limited liability company, originally licensed to do business in the City of Norfolk.[3] ECF No. 8 ¶ 2. Plaintiff Danny W. Fox ("Fox," and together with DARI, "Plaintiffs"), was the sole owner, shareholder, and director of DARI. Id. ¶ 2. At all times relevant to the instant case, Fox served as an active

---

[1] In considering a motion for summary judgment, the Court must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Because the Court grants Defendant's summary judgment motion in its entirety, it considers all evidence in the light most favorable to Plaintiffs.

[2] At the summary judgment stage, parties generally can only rely on facts supported by record evidence as provided in the summary judgment record. Fed. R. Civ. P. 56(c). Here, Plaintiffs' summary judgment motion presents an abbreviated factual background, whereas Defendant's summary judgment motion presents a more robust version of the facts. Because many of the background facts are undisputed, and to ensure that the Court draws all reasonable inferences in favor of Plaintiffs, the Court recounts Plaintiffs' version of the facts as set forth in both the Amended Complaint and the memorandum in support of Plaintiffs' motion for summary judgment. ECF Nos. 8, 44. The facts are supplemented by undisputed facts as presented in Defendant's summary judgment filings.

[3] It appears undisputed that DARI became inactive on November 30, 2018, when its existence as a limited liability company was automatically canceled by the Virginia State Corporation Commission as a result of unpaid annual registration fees. See ECF No. 42-9 ¶ 12.

duty servicemember with the United States Navy.  Id. ¶ 11.  In addition to his military career, Fox also purchases residential property with the intent to renovate homes to sell for a profit. Id. ¶ 12.  In line with this practice, Fox purchased residential property ("the Property") in Norfolk in June of 2015, and he transferred ownership of the Property to DARI in August of 2016. Id. ¶ 12, 14.  During the time that Fox or DARI owned the home at issue, it remained unoccupied.  ECF No. 44 ¶ 2.

In late 2016, Fox was deployed overseas, where he remained until March 2017.  Id. ¶ 5.  During that period, the City of Norfolk ("the City") conducted an inspection of the Property to ensure its compliance with state building standards.  ECF No. 8 ¶ 15.  Having purportedly found several building code violations, the City mailed separate Notices of Violation to both Fox and DARI on December 21, 2016.[4]  ECF No. 44 ¶ 5.  The City mailed both Notices, using "certified mail," to a post office box at a UPS store located at 4701 Shore Drive, Suite 103, Virginia Beach, Virginia.  Id.  At all times relevant to the instant matter, such address was the mailing address of record, on file with the City's tax assessor, with the record further demonstrating that Fox

---

[4] The December 21, 2016 Notices identified the following violations of Virginia's Uniform Statewide Building Code: (1) being unsafe for human habitation; (2) interior surfaces not being "properly maintained"; (3) lack of interior receptables; (4) lack of electrical systems; (5) improperly installed electrical equipment; (6) damage to the garage; (7) lack of properly functioning drainage systems; (8) damaged porch roof and support; and (9) damaged windows and doors.  ECF No. 44 ¶ 5.

maintained an "extra-large mailbox at the UPS store to hold his mail while he was gone." ECF No. 42 ¶ 3.  Still, according to Plaintiffs, neither Fox nor DARI received the City's December 2016 Notices, and Plaintiffs provide documentation indicating that the post office returned the notice sent to DARI when receipt of the letter could not be certified at DARI's address.[5] Id.  In addition, Plaintiffs assert that the City never attempted personal service of the December 2016 Notices.  Id. ¶ 6.  Plaintiffs also contend that there is no evidence indicating that the City posted the December 2016 Notices on the Property, and if they were posted, Plaintiffs argue that the Notices failed to mention the threat of demolition.  Id. ¶ 8.

Following the first set of notices, the City continued to mail letters to Plaintiffs regarding the status of the Property. ECF No. 8 ¶¶ 21, 25.  Notably, the City generated notices in February 2017, informing Plaintiffs that the Property was "unsafe and unhabitable," although the City has no record of whether such notices were mailed via "certified mail." ECF No. 42 ¶ 9.  A few months later, on May 11, 2017, the City again sent letters, notifying Plaintiffs that insufficient progress had been made to rectify the code violations.  Id. ¶ 21.  More than a year later, on June 5, 2018, the City generated a final set of notices that

---

[5] The Court recognizes that there is a factual dispute as to whether the December 2016 Notice addressed to Fox was also returned to sender, but the parties appear to agree that DARI's Notice was returned to sender.

4

expressly provided Plaintiffs with fourteen days to appeal the finding that the Property was "unsafe and uninhabitable." <u>Id.</u> ¶ 25.  Similar to Plaintiffs' assertions about the 2016 Notices, Plaintiffs maintain that both the May 2017 and the June 2018 Notices were not received, that at least one of DARI's letters was again returned to sender, and that Plaintiffs therefore lacked actual notice of the City's inspection and surveillance of the Property.  <u>Id.</u>  As it pertains to the June 2018 letters specifically, Plaintiffs also contend that "the City possesses no tangible proof of sending this notice" and that there is no evidence indicating that the City posted said Notice on the Property.  ECF No. 44 ¶ 10.

Due to Plaintiffs' lack of response to the various Notices, the City created a "Demolition Checklist" for the Property on July 12, 2018, citing the December 2016 letters as the operative demolition notices.  ECF No. 8 ¶ 26.  On July 18, 2018, the City entered Plaintiffs' property to reinspect the premises for open code violations.  <u>Id.</u> ¶ 27.  Having found remaining violations notwithstanding the multiple rounds of notices, a City contractor demolished the Property on December 13, 2018, <u>five months after the reinspection</u>.[6]  <u>Id.</u> ¶ 31.  According to Fox, he returned to

---

[6] It appears from the record that "trash and debris were found piled up on the Property in both 2017 and 2018," that "the ceilings in one part of the building were falling in," and that the "walls and ceilings in another part were entirely missing."  ECF No. 42 ¶ 13.

the Property "sometime before the end" of 2018 and discovered that the house had been demolished.  ECF No. 44-1, at 24-25.  "After the beginning of the year in 2019," Fox began communicating with City representatives to "figure out why [his] house had been destroyed."[7]  ECF No. 44-1, at 53-54.  Fox continued this investigation throughout the remainder of early 2019, including by filing a Virginia Freedom of Information Act request on April 2, 2019, seeking "data pertaining to the demolition."  Id. ¶ 28.

On December 13, 2021, three years after the house was demolished, Plaintiffs filed a complaint in this Court against the City, asserting five causes of action: a violation of procedural due process under the Fifth and Fourteenth Amendments to the U.S. Constitution, a violation of the Servicemember's Civil Relief Act ("SCRA") under 50 U.S.C. § 4042, a violation of Plaintiffs' Fourth Amendment rights against unreasonable searches and seizures, and a taking of private property for public use without just

---

[7] The Court notes that there is evidence in the record suggesting some prior communications between the City and Fox.  Notably, in April 2018, approximately eight months prior to the demolition, a person drove a car into Plaintiffs' house.  ECF No. 42 ¶ 21.  Upon learning of the damage from the car accident, Fox visited the Property and saw one of the Notices "affixed to the front of the house."  Id. ¶ 23.  Although Fox contends that most of the information on the notice was unreadable due to weathering, he was able to read the phone number listed, and he contacted Christina Jackson, the City's inspector.  Id.  Following a telephone conversation between Jackson and Fox, Fox emailed Jackson a list of repairs he intended to perform, which Fox indicated would take three to four months.  Id. ¶ 24.  Making reference to an "extension" to the deadline by which all repairs had to be completed, Jackson responded to Fox's email by requesting additional information about the timeline for the repairs and an address for future correspondence; however, the City never received a response from Fox.  Id. ¶ 26.

compensation, in violation of the Fifth Amendment and the Virginia Constitution.  Id. ¶¶ 34-86.

On February 2, 2023, the City filed its motion for summary judgment, contending that several of Plaintiffs' claims are time-barred and that the remainder fail as a matter of law.  ECF No. 41. On that same day, Plaintiffs filed their motion for summary judgment, arguing that the City is liable on all of the grounds asserted in the Amended Complaint.  ECF No. 43.  Both parties filed briefs in opposition, ECF Nos. 45, 46, and reply briefs, ECF Nos. 47, 49.  Accordingly, the matter is ripe for consideration.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that a district court shall grant summary judgment in favor of a movant if such party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The mere existence of some alleged factual dispute between the parties "will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247-48 (1986).  "A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party."  Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012).

7

Although the initial burden on summary judgment falls on the moving party, once a movant properly files evidence supporting summary judgment, the nonmoving party may not rest upon the mere allegations of the pleadings, but instead must set forth specific facts in the form of exhibits and sworn statements illustrating a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). "Because 'credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,'" the Court must only evaluate the evidence to the extent necessary to determine whether there is "sufficient disagreement to require submission to a jury or whether [the evidence] is so one-sided that one party must prevail as a matter of law." McAirlaids, Inc. v. Kimberly-Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (quoting Anderson, 477 U.S. at 251-52, 255). In making its determination, "the district court must 'view the evidence in the light most favorable to the' nonmoving party." Jacobs v. N.C. Admin. Off. of the Courts, 780 F.3d 562, 568 (4th Cir. 2015) (quoting Tolan v. Cotton, 572 U.S. 650, 657 (2014)).

When faced with cross-motions for summary judgment, each motion must be considered "separately on its own merits to determine whether either of the parties deserves judgment as a matter of law," and "all factual disputes and any competing, rational inferences" must be resolved "in the light most favorable

to the party opposing that motion." Defenders of Wildlife v. N.C.
Dep't of Transp., 762 F.3d 374, 392 (4th Cir. 2014) (internal
quotation marks omitted).

### III. Discussion

#### A. Parties' Summary Judgement Claims

Plaintiffs seek summary judgment on four grounds: (1) the
City failed to provide reasonable notice of demolition in violation
of the Fourteenth Amendment (the first cause of action); (2) the
SCRA protects a corporate entity wholly owned by an active duty
servicemember (the second cause of action); (3) the City conducted
a warrantless search and seizure of Plaintiffs' property in the
absence of an emergency (the third cause of action); and (4) the
City demolished Plaintiffs' property for a "public use", and thus
owes the owner, Fox, just compensation (the fourth and fifth causes
of action).  In direct opposition, the City seeks summary judgment
on the following grounds: (1) the applicable statute of limitations
bars Plaintiffs' First, Third, and Fourth Causes of Action; (2)
Fox is not the owner of the Property, and the benefits of the SCRA
do not extend to DARI; and (3) Plaintiffs' inverse condemnation
claims fail because the demolition was not for a compensable public
use recognized by Virginia law.  Based on the format of the
parties' briefing, the Court's analysis is arranged to address
each of Plaintiffs' causes of action individually.

### a. Plaintiffs' First and Third Causes of Action

Plaintiffs' Amended Complaint pursues two causes of action pursuant to 42 U.S.C. § 1983: (1) the first cause of action, claiming a violation of Plaintiffs' procedural due process rights under the Fifth and Fourteenth Amendments to the United States Constitution; and (2) the third cause of action, alleging a violation of Plaintiffs' Fourth Amendment rights.  As to these claims, Plaintiffs seek summary judgment on the merits, arguing that the City failed to provide adequate notice prior to "depriving [Plaintiffs'] of their property," ECF No. 44, at 10, and that the City "broke into, searched, and seized private property without danger or emergency, depriving Plaintiffs of fundamental rights in the process." Id. at 13.  Defendant, in its motion, seeks summary judgment on the basis that both causes of action are time-barred. ECF No. 42, at 9.  Although the parties' briefs on these issues delve heavily into the merits, the Court finds that the dispute regarding the applicable limitations period is dispositive.

Plaintiffs pursue their due process and Fourth Amendment claims under 42 U.S.C. § 1983, which does not contain its own statute of limitations.  Thus, "to determine the timely filing of a § 1983 claim, courts borrow the statute of limitations from the most analogous state-law cause of action." Owens v. Baltimore City State's Att'ys Off., 767 F.3d 379, 388 (4th Cir. 2014) (citing 42 U.S.C. § 1988(a)).  For Section 1983 suits, that cause

of action is a personal-injury suit.  _Wallace v. Kato_, 549 U.S. 384, 387 (2007).  In Virginia, personal injury suits have a two-year limitations period.  Va. Code § 8.01-243(A); _DePaola v. Clarke_, 884 F.3d 481, 486 (4th Cir. 2018).  The "accrual date of a § 1983 cause of action is a question of federal law that is _not_ resolved by reference to state law."  _Wallace_, 549 U.S. at 388. Under federal law, such a personal injury claim accrues "when the plaintiff has a 'complete and present cause of action,' . . . that is when 'the plaintiff can file suit and obtain relief."   _Id._ (citations omitted).  In other words, a § 1983 claim accrues "when the plaintiff knows or has reason to know of his injury."  _Owens_, 767 F.3d at 389 (citing _Wallace_, 549 U.S. at 388).

Plaintiffs argue the Court should not borrow the statute of limitations for personal injury suits, arguing that "there is no mandate that a court apply a personal injury statute of limitations when there is a more analogous cause of action available."   ECF No. 49, at 13.  Plaintiffs assert that the "most precise analog for constitutional deprivations caused by property damage" is Va. Code § 8.01-243(B), which states: "Every action for injury to property . . . shall be brought within five years after the cause of action accrues."  Va. Code § 8.01-243(B).  Defendant counters that the involvement of property "does not change the fact that the injury that occurs when due process is violated is a personal

injury," ECF No. 47, at 4, while separately advancing the same argument as to Plaintiffs' Fourth Amendment claim, id. at 17.

Notwithstanding Plaintiffs' contention that a five-year limitations period applies, the law is well settled that "a federal suit under the Civil Rights Act [including a § 1983 claim] is subject to the applicable state personal injury statute of limitations." Casteel v. Davidson, No. 2:06cv1, 2006 WL 229195, at *1 (W.D. Va. Jan. 31, 2006), aff'd, 228 F. App'x 343 (4th Cir. 2007); Bannister v. Knox Cnty. Bd. of Educ., 49 F.4th 1000, 1008 (6th Cir. 2022) ("The Supreme Court has thus held that § 1983 adopts the forum state's statute of limitations for personal-injury actions."); Coello v. DiLeo, 43 F.4th 346, 352 (3d Cir. 2022) ("The amount of time a § 1983 claimant has to bring suit is determined by the personal-injury law of the state where the alleged harm occurred."); McNair v. Allen, 515 F.3d 1168, 1173 (11th Cir. 2008) ("All constitutional claims brought under § 1983 are tort actions, subject to the statute of limitations governing personal injury actions in the state where the § 1983 action has been brought.") (emphasis added); Soto v. Sweetman, 882 F.3d 865, 871 (9th Cir. 2018) ("Federal courts in § 1983 actions apply the state statute of limitations from personal-injury claims and borrow the state's tolling rules.").

The Fourth Circuit has affirmed the application of this rule "even if the action involves a claim of injury to real property."

12

_Casteel_, 228 F. App'x 343; _see also_ _Ranney v. Nelson_, 176 F. App'x 405, 408-09 (4th Cir. 2006). Notably, in _Ranney_, the Fourth Circuit explained that it is "the object of the litigation and not its form [that] determines the applicability of a statute of limitations." _Ranney_, 176 F. App'x at 408-09 (citing _Richmeade, L.P. v. City of Richmond_, 267 Va. 598, 608-09 (2004)). Therefore, § 8.01-243(B) of the Virginia Code applies _only_ when the alleged wrongdoing is "aimed at the property" itself, not when the resulting loss of property "merely flow[ed] as a consequence" from an alleged constitutional injury. _Id._ at 408. As such, the Court found that even though Ranney attempted to "characterize[] his claim as one for injury to property," the constitutional cause of action before the court actually sought "recover[y] based on [an] alleged breach of duty [owed] to [Ranney] individually," and he was therefore bound by the two-year statute of limitations under § 8.01-243(A). _Id._

Other judges of this Court have reached the same conclusion, reasoning that "[a]llegations that a person's civil rights have been violated . . . are constitutional torts." _Harris v. Obenshain_, 452 F. Supp. 1172 (E.D. Va. 1978) (cleaned up). The "mere fact that property or personalty is involved does not change the focus of [] sections [1981-1986 of the Civil Rights Act]." _Id._ Because "Sections 1981-1986 are concerned with state contractual or property rights only so far as they are involved

with constitutional rights," they are tortious in nature.   Id. This "constitutional theory" underlies all civil rights cases in Virginia, "all of which have applied a two-year statute of limitations."   Id.   Therefore, this Court agrees that, here, the most analogous cause of action is a personal-injury suit, and thus, the applicable statute of limitations is two years from the date that Plaintiffs "knew or should have known of [their] injury." Owens, 767 F.3d at 389 (citations omitted); see also Va. Code. § 8.01-243(A).

### 1. Plaintiffs' First Cause of Action

The Court must now determine whether Plaintiffs' due process claim is time-barred, as it was filed on December 13, 2021, three years after the residence was demolished.   Notably, testimony from Fox's deposition reveals that he became aware of the Property's destruction sometime before the end of 2018.   ECF No. 44-1, at 25, 100; see also id. at 53-54 (admitting that Fox met with a City representative in "early 2019" in an effort to "figure out why [his] house had been destroyed").   Therefore, even when the facts are considered in the light most favorable to Plaintiffs, it is clear that they knew of the alleged due process injury by the end of 2018, placing this cause of action far outside of the applicable limitations period.   The Court therefore **DENIES** Plaintiffs' motion for summary judgment on the untimely first cause of action, and **GRANTS** Defendant's motion for summary judgment on this claim.

## 2. Plaintiffs' Third Cause of Action

Plaintiffs argue that the City's search of the Property in July of 2018 and the demolition of the structure in December of 2018 amounted to an unlawful search and an unlawful seizure, respectively. ECF No. 44, at 12. Plaintiffs allege that the City "broke into, searched, and seized private property without danger or emergency, depriving Plaintiffs of fundamental rights in the process." Id. at 13. Defendant argues in its summary judgment motion that Plaintiff knew or should have known that a search or seizure occurred no later than December of 2018 when Plaintiffs discovered the demolition. ECF No. 42, at 11.

Similar to Plaintiffs' due process claim, the facts do not clearly identify a specific accrual date for Plaintiffs' Fourth Amendment claim; however, the facts offer a general timeframe of Plaintiffs' discovery. Considering first the "seizure" resulting from the demolition of the structures, the undisputed facts reveal that the accrual date began sometime before the end of 2018 when Fox first discovered the Property's destruction. As to the search, the undisputed facts reveal that Fox began an investigation into why the structures were demolished in early 2019 and had a meeting with a City representative early that year. ECF No. 44-1, at 53-54. As Plaintiffs fail to offer any evidence or argument suggesting that Fox did not learn of the alleged search until December 2019 (two years prior to the filing of the instant suit),

15

the Court finds that Plaintiffs' third cause of action is untimely. Notably, in opposition to Defendant's contention that the third cause of action is time-barred, Plaintiffs never attempt to establish an accrual date within two years of filing, but instead only argue that the applicable limitations period for this claim is five years, rather than two.  Having found that the two-year period controls, the Court **DENIES** Plaintiffs' motion for summary judgment on the third cause of action, and **GRANTS** Defendant's motion on this claim.

### b. Plaintiffs' Second Cause of Action

The parties' respective summary judgment motions next assert that the Court should grant summary judgment on Plaintiffs' second cause of action, which alleges a violation of the SCRA under 50 U.S.C. §§ 4042 and 3931.  "The Servicemembers Civil Relief Act is part of a long record of congressional concern for the domestic affairs of those in military service." Gordon v. Pete's Auto Serv. of Denbigh, Inc., 637 F.3d 454, 457 (4th Cir. 2011).  In its current form, the SCRA "provides a variety of protections" for eligible servicemembers, including a private right of action for equitable and monetary relief.  Id.  The portion of the SCRA creating a private right of action to remedy violations of the Act's provisions states:

> "Any person aggrieved by a violation of this chapter may
> in a civil action (1) obtain any appropriate equitable
> or declaratory relief with respect to the violation;

> (2) recover all other appropriate relief, including
> monetary damages; and (3) be a representative party on
> behalf of members of a class or be a member of a class,
> in accordance with the Federal Rules of Civil Procedure,
> notwithstanding any previous agreement to the contrary."

50 U.S.C. § 4042.

In their motion, Plaintiffs assert that because the SCRA "applies to a single-member corporate entity owned wholly by an active-duty servicemember," ECF No. 46, at 18, the Court should grant summary judgment on this issue, finding that the "City's failure to observe Mr. Fox's rights as an active duty servicemember caused him to default on a finding of unsafety which let the City demolish his and DARI's property." ECF No. 44, at 12. Alternatively, Plaintiffs argue that Fox may pursue an SCRA claim even if DARI is not protected by the SCRA because Fox became the owner of the Property "by operation of law" when DARI ceased to exist in November of 2018. ECF No. 44, at 7 (citing Virginia Code § 13.1-1050.2(C)).

Defendant contends that Plaintiffs' second cause of action fails as a matter of law, arguing that "for the SCRA to apply, the person seeking its protection must fit within the scope of a servicemember." ECF No. 42, at 25. Defendant argues that (1) Fox, not DARI, is the only Plaintiff that can benefit from SCRA's protections, and (2) because Fox "was not the owner of the property" when demolition occurred in December of 2018, Fox is unable to prevail on a claim under the SCRA. Id. Defendant

17

separately argues that Plaintiffs fail to identify any violation of the SCRA.  Id.

The Court begins its analysis by addressing the question of whether Fox or DARI was the legal owner of the Property at the time of demolition.  Beginning their analysis with Virginia Code § 13.1-1050.2(C), both parties accurately note that the statute states: "the properties and affairs of a limited liability company whose existence has been canceled . . . shall pass automatically to its managers."  Va. Code § 13.1-1050.2(C).  Defendant argues, however, that § 13.1-1050.2(C) later clarifies that the "automatic transfer" only occurs when members of the cancelled corporation act as "trustees in liquidation," id., and instructs the trustees on the necessary process to acquire all distributed assets. Defendant contends that no such formal "liquidation" process occurred here.  ECF No. 42, at 18.

Notwithstanding Defendant's argument, in instances where there is no evidence to suggest that a corporate entity has "business to wind up or outstanding debts to pay," the Fourth Circuit has found that any remaining assets automatically flow through to the sole interest-holder of the cancelled or inactive corporate entity.  In re Kang, 664 F. App'x. 336 (4th Cir. 2016). This conclusion is further supported by a plain reading of the statute, which states: "[a]fter paying or adequately providing for the payment of all its obligations, the trustees shall distribute

18

the remainder of its assets, either in cash or in kind, among its members or interest holders according to their respective rights and interests." Va. Code § 13.1-1050.2. Here, the facts indicate, and Defendant does not contest, that there were no outstanding debts or business matters for DARI to wind up following its cancellation. ECF No. 46, at 15. Accordingly, the Court finds § 13.1-1050.2(C) applicable in this case, and concludes that the Property automatically passed to Fox, the sole owner of DARI, in November of 2018 when the Virginia State Corporation Commission canceled the limited liability company as a result of unpaid annual registration fees. Although this finding establishes Fox's standing to assert an SCRA claim, as explained below, the summary judgment record demonstrates the absence of a viable cause of action under the SCRA.

Having addressed the threshold question of whether Fox owned the Property so as to create any right of action under the SCRA, the Court now addresses the substantive SCRA claims. Plaintiffs' summary judgment briefing explicitly invokes 50 U.S.C. §§ 3931 and 4042 as the basis for a cause of action under the SCRA, and characterizes the cause of action as relief from "default judgment." ECF No. 44, at 10. In opposition, Defendant contends that Plaintiffs fail to identify what "default judgment" can be set aside in this case, and accordingly, what relief can be

19

provided under the cited sections of the SCRA.  ECF No. 49, at 14.

Section 3931 of the SCRA, in pertinent part, provides:

> "If a default judgment is entered in an action covered
> by this section against a servicemember during the
> servicemember's period of military service (or within 60
> days after termination of or release from such military
> service), the court entering the judgment shall, upon
> application by or on behalf of the servicemember, reopen
> the judgment for the purpose of allowing the
> servicemember to defend the action if it appears that--
> (A) the servicemember was materially affected by reason
> of that military service in making a defense to the
> action; and (B) the servicemember has a meritorious or
> legal defense to the action or some part of it."

50 U.S.C. § 3931. "Although the SCRA does not define 'default

judgment,'" the phrase "generally means 'a judgment entered by the

Court as a penalty against a party for failure to appear or

otherwise to perform a procedurally required act.'"  Fodge v.

Trustmark Nat'l Bank, 945 F.3d 880, 883 n.1 (5th Cir. 2019)

(quoting Anchorage Assocs. v. V.I. Bd. of Tax Review, 922 F.2d

168, 174 n.3 (3d Cir. 1990)).

Here, Plaintiffs do not allege that a "default judgment" was

entered against them by any court prior to the demolition of the

residence.  Although Plaintiffs' Amended Complaint suggests that

Plaintiffs "default[ed]" in 2018 by failing to appeal the City's

administrative determination that the residence was unsafe and

unhabitable within fourteen (14) days, neither the Plaintiffs nor

the Court's independent research has provided any basis to conclude

that a failure to appeal an administrative determination is the

legal equivalent to a "default judgment" as required by § 3931 of the SCRA.[8]  Rather, as Defendant correctly notes, § 3931 applies only to "any civil action or proceeding," and there is no record of any state or federal civil proceeding filed prior to the commencement of the instant civil action in 2021.[9]

Moreover, to the extent that Plaintiffs attempt to rely solely on the SCRA's private right of action under § 4042, such argument fails.  It bears repeating that § 4042 merely enables a servicemember who has been "aggrieved by a violation of the [SCRA]" to bring a civil action to obtain equitable or monetary relief. That is, § 4042 authorizes a civil suit when another section of the SCRA has been violated.  Here, because Plaintiffs do not assert facts that could support a violation of § 3931, nor do they identify any other provision of the SCRA that was violated, they fail to advance a viable cause of action under § 4042 of the SCRA. For these reasons, Plaintiffs' motion for summary judgment on the

---

[8] Furthermore, even if this failure to appeal amounted to a "default judgment," at the time it occurred (June of 2018), DARI, not Fox, was the owner of the Property, and contrary to Plaintiffs' arguments, this Court concludes that when Fox transferred assets to the corporation (securing the legal protections provided by the corporate form), he lost the ability to invoke the benefits of the SCRA, which is designed to protect the servicemember, not corporations owned by the servicemember.  Davis v. City of Philadelphia, 821 F.3d 484 (3rd Cir. 2016).

[9] Plaintiffs also fail to produce any evidence that indicates that they sought a stay of any civil or administrative proceedings prior to the filing of the instant suit.  Notably, there is no evidence that the City conducted any proceedings, including a condemnation proceeding.  Nor is there any evidence that Plaintiffs informed any City officials in their communications following the car crash that Fox was in the military and needed time to perform repairs.

second cause of action is **DENIED**, and Defendant's summary judgment motion is **GRANTED**.

### c. Plaintiffs' Fourth and Fifth Causes of Action

Finally, both parties seek summary judgment as to Plaintiffs' fourth and fifth causes of action, which advance "inverse condemnation" claims based on the assertion that the City took Plaintiffs' property for a "public use" without just compensation. Plaintiff's fourth cause of action arises under the Fifth Amendment of the U.S. Constitution, and similar to the other federal constitutional claims addressed herein, it relies on 42 U.S.C. § 1983 as the procedural vehicle for advancing the constitutional claim.   Plaintiff's fifth cause of action is a state law inverse condemnation claim under Article I, § 11 of the Virginia Constitution.

In support of both causes of action, Plaintiffs argue that summary judgment in their favor is warranted since "the City demolished" the residence and "took and damaged" the structure for a public use identified in Va. Code. § 1-219.1(A).  ECF No. 44, at 7-8.   Defendant asserts that: (1) Plaintiffs' § 1983 claim, under the Fifth Amendment, is time-barred; (2) neither Fox nor DARI are entitled to just compensation for the demolition of the building because Fox is the not the legal owner and DARI is an inactive corporate entity; and (3) "the only public use, if any, that was accomplished when the City demolished" the structure was the

22

elimination of blight, "which cannot result in an award of just compensation." ECF No. 42, at 17-24. In opposition, Plaintiffs argue that the most analogous state-law cause of action provides a three-year limitations period,[10] and that the City "abuses and perverts Va. Code § 1-219.1 to insulate an unlawful taking," thereby making a compensable taking "impossible" to pursue. ECF No. 46, at 14.[11]

### 1. Plaintiffs' Fourth Cause of Action – Fifth Amendment Inverse Condemnation Claim

The Court turns first to the timeliness of Plaintiffs' claim alleging a Fifth Amendment violation, finding Defendant's

---

[10] Plaintiffs argue that Article I, § 11 of the Virginia Constitution and Va. Code § 8.01-187 constitute a "precise state-law analog to a taking without just compensation under the Fifth Amendment." See Richmeade, 267 Va. at 598 (holding that a state-law inverse condemnation action is subject to the three-year statute of limitations governing implied contracts).

[11] Plaintiffs argue, relying only on a free speech and equal protection rights case, that because Virginia law recognizes the right to own property as a "fundamental right," this Court should apply "strict scrutiny" to their inverse condemnation claims. ECF No. 46, at 8. Plaintiffs, however, fail to cite any Virginia or federal precedent involving property rights, and contrary to Plaintiffs' suggestion, strict scrutiny is not called for "whenever a fundamental right is at stake." Heller v. D.C., 670 F.3d 1244, 1256 (D.C. Cir. 2011) (citing cases for the proposition that even with respect to First and Second Amendment rights, the level of scrutiny turns on "the nature of the conduct being regulated" and the "degree to which the challenged law burdens the right") (citations omitted). Presumably, Plaintiffs do not contend that they have a fundamental right to maintain a nuisance property. Moreover, federal property rights law reveals that eminent domain actions are generally entitled only to rational basis review. See Hawaii Hous. Auth. v. Midkiff, 467 U.S. 229, 241 (1984) ("[W]here the exercise of the eminent domain power is rationally related to a conceivable public purpose, the Court has never held a compensated taking to be proscribed by the Public Use Clause"); City of Alexandria v. Hoffman Fam., LLC, 70 Va. Cir. 22 (2005) (citing Midkiff and City of Richmond v. Dervishian, 190 Va. 398, 405 (1950), and noting that the former required a "rational basis" for exercising eminent domain power). However, even assuming without deciding that Plaintiffs are correct that strict scrutiny applies to their Virginia law inverse condemnation claim, see Virginia

limitations argument dispositive.   As discussed above, in determining "the timely filing of a § 1983 claim, courts borrow the statute of limitations from the most analogous state-law cause of action."   Owens, 767 F.3d at 388.   The Supreme Court has expressly recognized, however, that determining the most analogous state-law cause of action does not envision a claim-by-claim approach, but rather, § 1983 provides "a directive to select, in each State, the one most appropriate statute of limitations for all § 1983 claims." Wilson v. Garcia, 471 U.S. 261, 274-76 (1985); see Owens v. Okure, 488 U.S. 235, 240 (1989) (reiterating the "problems inherent in the case-by-case approach," and the requirement that courts "borrow and apply to all § 1983 claims the one most analogous state statute of limitations") (emphasis added).   When a state has multiple limitations periods applicable to different types of personal injury actions, the Supreme Court directs that district courts presented with § 1983 claims "should borrow the general or residual statute for personal injury actions." Owens, 488 U.S. at 250.

Accordingly, the Court rejects Plaintiffs' effort to apply a § 1983 limitations period specific to inverse condemnation claims that borrows from Virginia contract law, and reiterates its earlier

---

Uranium, Inc. v. Commonwealth, 105 Va. Cir. 421 (2020), Plaintiffs fail to identify which state law or city code sections authorizing the City to enforce building codes and/or abate a nuisance are unconstitutional under such heightened standard of review.

finding that the most analogous cause of action for <u>any</u> § 1983 claim is a personal-injury suit.  Therefore, in Virginia, the applicable limitations period for <u>all</u> § 1983 claims is the two year limitations period applicable to personal injury claims. Because Plaintiffs' Fifth Amendment inverse condemnation claim was filed nearly three years after Fox discovered the demolition of the residence, the Court **DENIES** Plaintiffs' motion for summary judgment on the untimely fourth cause of action and **GRANTS** Defendant's motion for summary judgment on this claim.

### 2.  Plaintiffs' Fifth Cause of Action – State Inverse Condemnation Claim

Although the Court has disposed of Plaintiffs' Fifth Amendment inverse condemnation claim, a brief explanation of "inverse condemnation" claims, at both the federal and state levels, is appropriate prior to addressing Plaintiffs state-law inverse condemnation claim (the Fifth Cause of Action, which is timely).  The Fifth Amendment to the United States Constitution prohibits the taking of private property for public use without just compensation.  Therefore, under the Fifth Amendment, the government may "take property for public use without the consent of the owner," by initiating "legal proceedings or simply by taking possession up front, with compensation to follow."  <u>PennEast Pipeline Co., LLC v. New Jersey</u>, 141 S. Ct. 2244, 2251 (2021). Such legal proceedings are often referred to as "condemnation

proceedings" and are commonly understood to be actions "brought <u>by</u> a condemning authority in the exercise of its power of eminent domain." <u>United States v. Clarke</u>, 445 U.S. 253, 255 (1980). In the reverse, the Fifth Amendment has also historically been used by landowners to "recover[] just compensation for a taking of [] property when condemnation proceedings [were] not [] instituted." <u>United States v. Clarke</u>, 445 U.S. 253, 257 (1980).[12] In addition to federal protections, every state besides Ohio allows a plaintiff to recover damages through a state-law inverse condemnation action. <u>Knick v. Twp. of Scott, Pennsylvania</u>, 139 S. Ct. 2162, 2168 (2019). Virginia law specifically provides both a constitutional and statutory procedure for property owners to obtain compensation for governmental takings, with Virginia Code §§ 8.01-184, 8.01-187 explicitly providing for an inverse condemnation remedy. <u>Livingston v. Virginia Dep't of Transp.</u>, 284 Va. 140, 150 (2012); <u>see also</u> <u>Kitchen v. City of Newport News, Va.</u>, 485 F. Supp. 2d 691, 693 (E.D. Va. 2007).

For both federal and Virginia inverse condemnation suits, Plaintiffs correctly state that the elements of the cause of action

---

[12] In other words, in contrast to a condemnation action initiated by the condemning public agency, an "inverse condemnation action" is an eminent domain action initiated by the landowner or the person whose property was taken for public use. <u>See</u> <u>Pac. Bell v. City of San Diego</u>, 81 Cal. App. 4th 596, 601 (2000). The principles of eminent domain law apply to inverse condemnation proceedings because "[i]n inverse condemnation cases, the law implies the constitutional duty of compensation in circumstances where the taking or damaging of private property would be compensable under traditional eminent domain principles." <u>AGCS Marine Ins. Co. v. Arlington Cnty.</u>, 293 Va. 469, 478 (2017).

require: "(1) [a] private property interest, (2) that [the] interest is taken or damaged by a government entity with condemnation authority, (3) that the taking or damaging was for public use, and (4) that the government failed to pay just compensation." ECF No. 8 ¶ 78 (citing Kitchen v. City of Newport News, 275 Va. 378, 386 (2008); Close v. City of Norfolk, 82 Va. Cir. 636, 640 (2009)). The parties' briefing on this issue focuses on both the first and third elements, with Defendant arguing that Plaintiffs' lack of a property interest, as required by the first element, is dispositive. However, for the reasons explained above, the Court finds that the first element is satisfied since Fox, upon the cancellation of DARI, became the legal owner of the disputed property. Accordingly, the Court's takings analysis focuses on the third element, requiring that the taking/damaging was for a "public use." Additionally, the Court considers the contours of the City's police power to abate nuisance properties.

### i. Compensable Takings for "Public Use" under Virginia Law

To assist in resolving whether the third element of Plaintiffs' inverse condemnation claim is satisfied, the Court first reviews the development of the meaning of the term "public use." In 2005, the United States Supreme Court delivered its landmark decision, Kelo v. New London, 545 U.S. 469 (2005), in which it held that it was a valid "public use" to condemn non-blighted private land and transfer it to a private developer "to

promote economic development." Kelo, 545 U.S. at 470.  Although, the Supreme Court's Kelo opinion expanded the breadth of the government's taking power by broadening the definition of "public use," the Court expressly indicated that "nothing in [its] opinion preclude[d] any State from placing further restrictions on its exercise of the takings power." Id.

In 2007, Virginia accepted the Supreme Court's invitation by enacting Virginia Code § 1-219.1(A), which "provides an exclusive definition of 'public uses' and limits the 'acquisition' of private property to these specified uses." AGCS Marine Ins. Co. v. Arlington Cnty., 293 Va. 469, 478 n*4 (2017).  Section 1-219.1(A), entitled "Limitations on Eminent Domain," states:

> "The right to private property being a fundamental right, the General Assembly shall not pass any law whereby private property shall be taken or damaged for public uses without just compensation. The term "public uses" mentioned in Article I, Section 11 of the Constitution of Virginia is hereby defined as to embrace only the acquisition of property where: (i) the property is taken for the possession, ownership, occupation, and enjoyment of property by the public or a public corporation; (ii) the property is taken for construction, maintenance, or operation of public facilities by public corporations or by private entities provided that there is a written agreement with a public corporation providing for use of the facility by the public; (iii) the property is taken for the creation or functioning of any public service corporation, public service company, or railroad; (iv) the property is taken for the provision of any authorized utility service by a government utility corporation; (v) the property is taken for the elimination of blight provided that the property itself is a blighted property; or (vi) the property taken is in a redevelopment or conservation area and is abandoned or the acquisition is needed to

> clear title where one of the owners agrees to such
> acquisition or the acquisition is by agreement of all
> the owners."

Va. Code § 1-219.1(A).

A few years later, in 2012, the Virginia electorate conclusively limited the definition of "public use" by amending the Constitution of Virginia.[13]  Virginia's Attorney General, in an official advisory opinion, described this constitutional amendment as "incorporate[ing] a number of central concepts contained [in the statute]." 2012 WL 339606, at *4 (Va. A.G. Jan. 26, 2012).  The 2012 constitutional amendment provided:

> "[T]he General Assembly shall pass no law whereby
> private property, the right to which is fundamental,
> shall be damaged or taken except for public use.  No
> private property shall be damaged or taken for public
> use without just compensation to the owner thereof. No
> more private property may be taken than necessary to
> achieve the stated public use.  The terms "lost profits"
> and "lost access" are to be defined by the General
> Assembly. A public service company, public service
> corporation, or railroad exercises the power of eminent
> domain for public use when such exercise is for the
> authorized provision of utility, common carrier, or
> railroad services.  In all other cases, a taking or
> damaging of private property is not for public use if
> the primary use is for private gain, private benefit,
> private enterprise, increasing jobs, increasing tax
> revenue, or economic development, except for the
> elimination of a public nuisance existing on the
> property. The condemnor bears the burden of proving that
> the use is public, without a presumption that it is."

Va. Const. art. I, § 11.

---

[13] This amendment took effect on January 1, 2013.

Here, Plaintiffs argue that their property was demolished for a reason that would qualify as a "public use". ECF No. 44, at 7; see also ECF No. 44-8, at 1. Although Plaintiffs do not explicitly identify which "public use" their state law inverse condemnation claim is predicated on, Defendant appears to concede that the only potentially applicable "public use" accomplished by the City's demolition of the residence was the "elimination of blight," which by statute covers nuisance properties. ECF No. 42, at 23. Section 1-219.1(B) of the Virginia Code defines "blighted property" as "any property that endangers the public health or safety in its condition at the time of the filing of the petition for condemnation and is (i) a public nuisance or (ii) an individual commercial, industrial, or residential structure or improvement that is beyond repair or unfit for human occupancy or use." Va. Code § 1-219.1(B) (emphasis added).

### ii. Non-Compensable Nuisance Abatement under the Police Power

In addition to the fact that the state, or a subdivision thereof, can lawfully utilize its eminent domain power to "take" a blighted nuisance property from a private owner in order to redevelop it, the state possesses a separate police power to abate public nuisances without compensation to the owner. This latter power generally includes the right to demolish "an unsafe structure that is a public nuisance if the owner fails to . . . repair, rehabilitate or demolish the structure," and is "an official act

30

taken by municipalities across the country." Embassy Realty Invs.,
Inc. v. City of Cleveland, 572 F. App'x 339, 344 (6th Cir. 2014).
To be clear, even where a state constitution expressly "prohibit[s]
the taking of private property for public use without just
compensation," as is the case in Virginia, "such compensation is
not mandated when the state legitimately exercises police power to
abate a property nuisance." Id. One explanation as to why this
does not create a constitutional conflict is that "all property
within the state is held subject to the implied condition that it
will be so used as not to injure the equal right of others to the
use and benefit of their own property," and when a landowner
violates this implied condition notwithstanding the government's
ongoing effort to convince the landowner to timely eliminate the
nuisance condition, the state may exercise its police power if
"the restriction be reasonably necessary for the preservation of
the public health, morals, or safety." Id. (citation omitted).
Stated another way, the right to exercise the police power to abate
a nuisance without compensation, and the ability to exercise the
"takings" power through eminent domain, were historically viewed
as "completely separate and compartmentalized powers that did not
overlap." 13 Powell on Real Property § 79F.05[1]; see id.
§ 79F.05[iv] ("Regulations designed to suppress nuisances or
nuisance-like uses have been upheld consistently, even though they
result in destruction or substantial diminution in property

interests on the theory that the regulations were designed to prevent harm.").

Here, Defendant argues that "a taking of nuisance property done for public safety reasons is not compensable under the law of condemnation." ECF No. 42, at 24 (citing Sansotta v. Town of Nags Head, 724 F.3d 533, 541 (4th Cir. 2013); Stickley v. Givens, 176 Va. 548, 561 (1940)). Consistent with the above discussion of compartmentalized spheres of authority, well-established federal and Virginia caselaw provides that the exercise of the police power by a public body to abate a public nuisance is not a compensable taking. See Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 492 (1987); Sansotta, 724 F.3d at 541; Lee v. City of Norfolk, 281 Va. 423 (2011); Stickley, 176 Va. at 562; Jeremy Improvement Co. v. Commonwealth, 106 Va. 482, 490 (1907).

In response to Defendant's argument that no compensation is due to Plaintiffs under eminent domain law, Plaintiffs contend that the "police power" body of law creates a "catch-22" – because Plaintiffs seemingly must prove that the Property was a "nuisance" to demonstrate that it is "blighted property" as necessary to prove a "public use" in support of their inverse condemnation claim, but if they succeed, they will also demonstrate that the Property was a nuisance subject to police power abatement, which would preclude recovery of just compensation. ECF No. 46, at 11. Plaintiffs' "catch-22" argument appears to be more of an equitable argument

than a response to the fact that longstanding Virginia precedent establishes that the abatement of a nuisance under the police power is not compensable. Moreover, Plaintiffs do not directly challenge the constitutionality of the Virginia Uniform Statewide Building Code ("USBC") provisions that were invoked in this matter to inform Plaintiffs that they needed to either repair their property or demolish the unsafe structure. Notably, the USBC expressly permits municipalities to "cause an unsafe building or structure to be demolished" where "an owner of an unsafe building or structure fails to comply with a notice to demolish issued under Section 118.4 in the time period stipulated." USBC § 118.7.

### iii. Continued Vitality of Police Power in Virginia

Though Plaintiffs fail to directly argue that Virginia's longstanding police power to abate nuisances without compensation has been superseded by recent amendments to Virginia's governing statute and constitution, the Court found it appropriate to ensure that this unraised argument, which may be colorable at first blush, is not obviously meritorious such that the only reasonable interpretation of Virginia's current law is that nuisance abatements must now always be compensated. As explained below, and in the absence of such a claim being directly pursued by Plaintiffs, there is no valid basis to upset the longstanding Virginia precedent authorizing police-power abatements.

Much of the relevant caselaw discussing the police power predates both the 2007 enactment of Va. Code § 1-219.1 and the 2012 amendment to Article I, Section 11 of the Virginia Constitution. See, e.g., Keystone, 480 U.S. at 492; Stickley, 176 Va. at 562; Jeremy Improvement, 106 Va. at 490. The recency of Virginia's constitutional amendment is notable based on the Virginia precedent establishing that "[a]ll statutes existing when [] a Constitution[al] [amendment] is adopted, . . . [which are] inconsistent with its provisions, are nullified by such constitutional prohibition" (emphasis added). Swift & Co. v. City of Newport News, 105 Va. 108, 115 (1906). Naturally, this Court similarly presumes that such proposition also extends to all preexisting caselaw that is inconsistent with the provisions of a new constitutional amendment.

Upon review, and in the absence of a claim from Plaintiffs, the Court declines to sua sponte find that longstanding police-power precedent was superseded by either the enactment of § 1-219.1, or Virginia's constitutional amendment. First, as it relates to the 2007 enactment of Va. Code § 1-219.1, in 2011, the Virginia Supreme Court, "held that in demolishing a residential building, a Virginia city was immune from such claims as implied condemnation or inverse condemnation for exercising its police power to abate the public nuisance that it deemed the building to pose." Sinclair on Virginia Remedies § 64-1 (2022); see Lee, 281

34

Va. at 423.   Thus, more than three years after § 1-219.1 became effective, the Virginia Supreme Court continued to acknowledge the police power "nuisance" carve out from compensable takings claims.

After 2011, additional Virginia Supreme Court precedent reveals that the 2012 constitutional amendment also did not have a substantive impact on this body of nuisance law.   Most persuasively, in 2017 the Virginia Supreme Court analyzed Article I, § 11 and held that "[n]owhere does the amended [constitutional] language purport to modify existing property rights."   Palmer v. Atl. Coast Pipeline, LLC, 293 Va. 573, 584 (2017).   Among other things, the Court detailed that the American Law Institute's first Restatement of Torts outlines various common law privileges concerning private property.   Id. at 581-582 (citing Restatement (First) of Torts §§ 191-211 (1934)).   With regard to these common law privileges, the Court explained that although the recent constitutional amendment "explicitly states that the right to 'private property' is 'fundamental,' . . . it certainly did not abrogate the extensive common law privileges catalogued by the [first] Restatement and recognized in Virginia statutory law."   Palmer, 293 Va. at 584.   Notably, included in such privileges is the authorization of a public official, "who by virtue or by statute is authorized to abate a public nuisance, . . . to enter land in the possession of another for the purpose of abating such a nuisance."   Restatement (First) of Torts § 202.   Therefore, as

the Virginia Supreme Court stated, the 2012 constitutional amendment did not "add any sticks to [Plaintiff's] bundle of property rights that did not already exist," and instead, "[i]t primarily, in response to Kelo, limited the parameters within which eminent domain may be exercised to affect these rights and expanded the compensation to be paid." Id.

In further support of this interpretation of the plain language of the Constitution, Virginia's Attorney General, in his official advisory opinion, confirmed that "the extensive body of statutory and case law regarding eminent domain that has been enacted and developed over the years will continue to provide valuable direction and precedent, except where inconsistent with the proposed Amendment." 2012 WL 339606, at *6 (Va. A.G. Jan. 26, 2012). Moreover, the Attorney General explained that the "ability of the General Assembly to define public uses will continue, subject to constitutional limitations" included in the constitutional amendment. Id. In light of these Virginia authorities, and in the absence of a contrary argument from Plaintiffs, this Court does not identify a valid basis to make the sua sponte finding that long-established Virginia law, regarding the abatement of a nuisance under the police power, has been superseded by recent enactments that were adopted to avoid the expansion of the definition of public use and to increase the

amount of compensation recoverable in cases where compensation is otherwise due.

### iv. Whether Disputed Facts Preclude Summary Judgment

The Court now turns to Plaintiffs' contention that summary judgment in Defendant's favor is precluded because there is a genuine dispute of material fact over "whether or not the property constituted a nuisance." ECF No. 49, at 6. Defendant, in its motion, contends that there is not a "genuine" dispute of fact regarding whether Plaintiffs' property was a "nuisance"; however, Defendant asserts that even if there were genuine disputes, a ruling on this issue is unnecessary because any disputes are not material to the resolution of Plaintiffs' fifth cause of action. The Court agrees. Notably, if the Court were to find the City's assertion factually correct – that Plaintiffs' property qualified as a nuisance under Virginia law – the Court would conclude that the City's demolition of the Property was a proper exercise of police power and not a compensable taking.[14]  As a result, Plaintiffs' inverse condemnation claim would fail. If, on the other hand, the Court were to find that Plaintiffs are correct – that the Property was not a nuisance because, though it needed repairs, it was not "unsafe," the Property would not be a nuisance,

---

[14] To be clear, there is no evidence in the record that the City sought to take control of Plaintiffs' property pursuant to a redevelopment plan to eliminate blight by invoking its eminent domain power to seize ownership of the blighted property.  Rather, this matter involved building code enforcement.

but it also would "not constitute a blight," and the "public use" element of an inverse condemnation claim would be unsatisfied, thus defeating Plaintiffs' inverse condemnation claim.   ECF No. 42, at 24.   It bears repeating that to "state a claim for inverse condemnation, a [Plaintiff] must allege 1) she owns private property or has some private property right, 2) the property or a right connected to that property has been taken or damaged by the government or a body with condemnation authority, 3) the taking or damaging was for "public use," and 4) the government or condemning authority failed to pay just compensation." Close, 82 Va. Cir. at 640 (emphasis added) (cleaned up).   By arguing that the Property did not constitute a "nuisance" under Virginia law, Plaintiffs undercut their own assertion that the Property was demolished for a "public use" or as "blight" under Va. Code § 1-219.1, with "blighted property" under the statute defined, in part, as a "public nuisance."   Va. Code § 1-219.1(B).   In light of this, the Court finds the absence of a dispute over a material fact because even under Plaintiffs' version of the facts whereby their property was not a "nuisance," Plaintiffs state law inverse condemnation claim fails.   For these reasons, the Court **DENIES** Plaintiffs' motion for summary judgment on the fifth cause of action, and **GRANTS** Defendant's summary judgment motion.[15]

---

[15] As noted above, Defendant asserts the lack of any "genuine" dispute over whether Plaintiffs' property was a "nuisance," but does not seek a Court ruling on such issue because it would have no impact on the outcome.

The Court feels compelled to note that, to the extent that much of Plaintiffs' summary judgment arguments are grounded in the City's purported failure to provide adequate notice that demolition would occur if the residence's code violations were not timely rectified, such arguments are time-barred due process claims, not claims that bear on whether the Property was actually a nuisance. Furthermore, Plaintiffs were not without a remedy even if the City failed to provide adequate notice prior to the demolition (as Plaintiffs' claim) or improperly declared the Property a "nuisance" when it posed no threat to public safety, because Plaintiffs could have: (1) asserted a timely § 1983 due

_____

Agreeing with this immateriality argument, the Court does not squarely analyze the competing versions of the facts. However, were this matter at issue, the Court notes that the record clearly favors Defendant as it provided evidence demonstrating that "the ceilings in one part of the building were falling in," and that the "walls and ceilings in another part were entirely missing," among other issues. ECF No. 42, at 5. In response, Plaintiffs point to counter facts demonstrating that new lumber was "on site" in June of 2018 and that there is photographic evidence of repairs to at least one interior wall. Plaintiffs' evidence, which appears to at best demonstrate that Fox hoped or intended to correct the structural, electrical, and other issues that caused the City to classify the building as "unsafe" and "uninhabitable," appears insufficient to demonstrate that significant structural repairs (unrelated to the 2018 car accident) were actually completed by the July 2018 reinspection date or by the time of demolition. Cf. ECF No. 42-7, at 42 (reflecting Plaintiffs' written acknowledgment in May of 2018 that the house was "in disrepair" and needed numerous repairs that would take months to complete); ECF No. 42 ¶ 25 (establishing that Fox never "obtain[ed] any building permits related to any repair work"). Not only do the record facts favor Defendant, but there is no evidence suggesting that Plaintiffs ever attempted to administratively challenge the "unsafe" and "uninhabitable" classification. See Lee v. City of Norfolk, No. CL08-393, 2009 WL 8496521 (Va. Cir. Ct. June 25, 2009) ("The USBC provides the City with the authority to exercise its police power where a condition has the effect of creating a public nuisance," and when a plaintiff fails to use the administrative process to challenge whether the property is "dangerous and constitute[s] a public nuisance," the plaintiff is precluded from obtaining court review of whether it is "a threat to public safety.").

process claim; and/or (2) appealed the City's enforcement of the USBC in an effort to demonstrate that the Property was not a nuisance, see Lee, 281 Va. at 438 (indicating that failure to appeal the City's nuisance determination to the Board of Building Code appeals was fatal to the plaintiff's state law inverse condemnation claim as it rendered the nuisance determination "a thing decided").

## IV. CONCLUSION

For the reasons set forth above, the Court **GRANTS** Defendant's motion for summary judgment and **DENIES** Plaintiffs' motion for summary judgment. ECF Nos. 41, 43. In light of such ruling resolving all claims in Defendant's favor, this case is fully resolved.

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

/s/

Mark S. Davis
CHIEF UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
March 23, 2023